## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **A.B. PRATT & CO.,** | **CASE NO. 1:22-CV-1579-PAB** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **BRIDGEPORT GROUP, LLC, et al.,** | **MEMORANDUM OPINION AND** |
| **Defendants.** | **ORDER** |

Currently pending is Defendants Alshaw Technologies, Inc.'s and Lisa Peterson's (collectively, the "Peterson Defendants") Combined Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State Claim, or Alternatively, Motion to Transfer Venue.  (Doc. No. 15.) Plaintiff A.B. Pratt & Co. ("Pratt") filed an Opposition to the Peterson Defendants' Motion on November 30, 2022, to which the Peterson Defendants replied on December 14, 2022.  (Doc. Nos. 22, 23.)

Also on December 14, 2022, the Peterson Defendants filed a Motion to Disregard and/or Strike Portions of the Declaration of Abbie Pratt.  (Doc. No. 24.)  Pratt filed an Opposition to the Peterson Defendants' Motion to Strike on December 28, 2022, to which the Peterson Defendants replied on January 4, 2023.  (Doc. Nos. 26, 28.)

Also pending is Pratt's December 28, 2022 Motion for Leave to File Surreply in Opposition to the Peterson Defendants' Motion to Dismiss.  (Doc. No. 25.)  The Peterson Defendants filed an Opposition to Pratt's Motion for Leave on January 11, 2023.  (Doc. No. 29.)  Pratt did not reply.

Finally, also pending is Pratt's Motion to Dismiss Defendants Bridgeport Group, LLC's and Vail Network Company, Inc.'s (collectively, the "BPG Defendants") Counterclaim Counts 2 through

4 under Rule 12(b)(6), or Alternatively, a Motion for More Definite Statement under Rule 12(e). (Doc. No. 19.)  The BPG Defendants did not oppose Pratt's Motion to Dismiss Counterclaims 2 through 4.

For the following reasons, the Peterson Defendants' Motion to Dismiss and/or Transfer Venue is GRANTED IN PART and DENIED IN PART.  The Peterson Defendants' Motion to Strike is DENIED.  Pratt's Motion to File Surreply is DENIED.  Pratt's Motion to Dismiss Counterclaims 2 through 4 is GRANTED.

## I.     Relevant Factual Background

Plaintiff Pratt is an Illinois-based consulting company whose business includes mentoring, training, and recruiting individual consultants for federal government projects involving technology and management.  (Doc. 1, ¶¶ 1, 4.)  Pratt conducts separate negotiations with potential consultants and potential clients.  (*Id.*)  To protect Pratt's alleged proprietary work products and information, Pratt requires potential consultants and clients to sign various contracts.  (*Id.*)  For example, Pratt will not do business with a potential client unless it promises not to poach Pratt's recommended consultants.  (*Id.*)  Likewise, Pratt requires a potential consultant to promise not to solicit or pursue business opportunities facilitated by Pratt, lest Pratt, as the middleman, be cut out of its own deal. (*Id.*)

Pratt alleges that it "has unique expertise not publicly-known" and that its expertise "includes protected proprietary methods of both sourcing and training . . . technology personnel and ensuring their successful onboarding by end users."  (*Id.* at ¶ 10.)  Pratt's proprietary information allows Pratt to "rapidly identify, and train candidates for federal government security projects and provide other

2

unique solutions for the needs of government clients and end users that require immediate service." (*Id.*)

### 1. BPG Engages Pratt for Support on BPG's Federal Reserve Project

In May 2021, Defendant BPG approached Pratt.  (*Id.* at ¶ 12.)  BPG is a limited liability company whose members, on information and belief, are all citizens of Ohio.  (*Id.* at ¶ 5.)  BPG's principal place of business is in Ohio.  (*Id.*)  In early 2021, BPG had secured a contract with non-party Federal Reserve Bank of Cleveland ("FRB") to provide the FRB with "immediate software support personnel for bank security projects."  (*Id.*)  According to Pratt, BPG was struggling to rapidly hire qualified personnel that met the FRB's various requirements and the FRB had already rejected several of BPG's proposed candidates.  (*Id.*)  Pratt alleges that BPG was "desperate to keep its multi-year FRB contract which required it to supply software support personnel immediately."  (*Id.*)  Pratt and BPG entered into a Contract Service Agreement for Pratt to locate and retain qualified consultants for BPG to hire out to the FRB.  (*See* Doc. No. 1-1.)  The CSA provided that the "Agreement shall commence as of June 28[,] 2021 . . ."  (*Id.*)

Pratt alleges that within days of BPG's approaching Pratt, Pratt supplied 10 trained personnel, "all of whom were accepted by FRB and BPG for immediate selection and screening process."  (*Id.*) Pratt alleges that BPG leveraged Pratt's expertise and proprietary information and represented to the FRB that Pratt's consultants were BPG's consultants to gain credibility and extend its multi-year contract with the FRB.  (*Id.*)  Simultaneously, BPG promised Pratt a five-year contract that would entail multiple placements for Pratt personnel.  (*Id.*)  In August 2021, Pratt assisted BPG in drafting a Statement of Work for the FRB to bring on 10 additional consultants.  (*Id.*)  In October 2021, BPG

3

notified Pratt that it extended its contract with FRB and needed multiple additional trained personnel from Pratt so that BPG could expand its business into other FRB divisions.  (*Id.*)

According to Pratt, its relationship with BPG quickly soured.  Pratt alleges that BPG breached its contract with Pratt "almost immediately" when BPG refused to pay Pratt's first invoice, despite several warnings from Pratt.  (*Id.* at ¶ 14.)  Pratt alleges that BPG repeatedly breached the contract throughout 2021 by renegotiating payment terms for services already rendered by Pratt and refusing to pay invoices unless Pratt reduced previously agreed-upon hourly rates, and by soliciting and luring Pratt consultants, thereby "undermining" Pratt.  (*Id.*; *see also* Doc. No. 1-1, § 5.)  Pratt also alleges that BPG requested that Pratt consultants introduce BPG to other competing consulting companies to obtain services, which put the Pratt consultants in repeat violations of their own contractual obligations to Pratt.  (*Id.* at ¶ 16.)  Pratt alleges that it repeatedly notified BPG that these were violations of contractual commitments for all parties involved, but BPG allegedly ignored such warnings and continued withholding payment of invoices to Pratt.  (*Id.*)

Pratt alleges that at some point in 2021, BPG "sought assistance" from Vail Networking Company ("VN"), an Ohio-based corporation, to review and audit Pratt's invoices.  (*Id.* at ¶¶ 6, 15.)  According to Pratt, VN allegedly encouraged BPG to withhold payments due to Pratt, including amounts that BPG ended up billing to the FRB for work that Pratt performed.  (*Id.*)  Allegedly, BPG and VN worked together to delay authorization of hours worked by Pratt's consultants.  (*Id.* at ¶ 17.)  VN also allegedly interfered with payment and blamed the FRB for such delays.  (*Id.*)

As a result of BPG's alleged breaches and VN's interference throughout 2021 and 2022, Pratt allegedly lost several consultants and employees from the FRB project, resulting in significant

4

financial impact and hardship to Pratt, due to the losses of upfront costs as well as future client opportunities.  (*Id.* at ¶ 18.)

### 2.    Pratt Retains Peterson as Consultant for Federal Reserve Project[1]

While scouting qualified candidates on behalf of BPG, Pratt identified Lisa Peterson as a potential fit for the FRB security project.  (*Id.* at ¶ 19.)  Peterson is a citizen of Nebraska.  (*Id.* at ¶ 7.) According to the Declaration of Abbie Pratt, Pratt placed ads seeking potential candidates for the FRB project that advertised the position as an Ohio-based government contracting position.  (Doc. No. 22-2, ¶ 6.)  Abbie Pratt declared that Peterson responded to one such ad on June 22, 2021.  (*Id.*) In her Affidavit, Lisa Peterson averred that she responded to "an online job posting" and was contacted by Abbie Pratt regarding same on or about August 10, 2021.  (Doc. No. 15-3, ¶ 7.)  Pratt alleges that Peterson initially identified herself as an employee of a company called "Atech" or "Atechoma."  (Doc. No. 1, ¶ 20.)

According to Abbie Pratt, on August 10, 2021, she and Peterson had a conversation about a possible multi-year contracting opportunity with FRB for an Agile Scrum/Agile Coach consulting position.  (Doc. No. 22-2, ¶ 8; Doc. No. 26-1, ¶¶ 21, 28.)  During her first phone call with Peterson, Abbie Pratt indicates that she explained to Peterson that this position "was a high visibility consulting position in Ohio requiring 160 hours a month of full-time direct services performed for the Cleveland Teams for FRB in Ohio with continuous face to face collaborations through FRB's Microsoft Teams Platform using the Cleveland office equipment and secure token."  (Doc. No. 26-1, ¶ 22.)  Peterson

---

[1] In evaluating whether the Court has personal jurisdiction over the Peterson Defendants, the Court considers the factual allegations set forth in Pratt's Complaint, as well as the related averments set forth in Lisa Peterson's affidavits in support of her Motion to Dismiss (*see* Doc. Nos. 15-3, 23-1), and from Abbie Pratt's declaration in support of Pratt's Opposition and supplemental declaration filed in opposition to the Peterson Defendants' Motion to Strike Pratt Declaration (*see* Doc. Nos. 22-2, 26-1).  Additionally, as set forth below, the Court denies the Peterson Defendants' Motion to Strike portions of Abbie Pratt's Declaration, and so considers all related averments in Abbie Pratt's declarations.  *See infra* Part III.

expressed interest in the role.  (Doc. No. 26-1, ¶ 23.)  Accordingly, Abbie Pratt scheduled multiple face-to-face meetings between Peterson, several Cleveland, Ohio-based FRB supervisors, and BPG project leaders to take place in late August 2021.  (*Id.* at ¶ 8; *see also* Doc. No. 26-1, ¶ 25.)  Following these interviews, the FRB rejected Peterson as a candidate for the Agile Coach position, due to her lack of certifications in that area.  (Doc. No. 1, ¶ 19; *see also* Doc. No. 26-1, ¶ 28.)

According to Abbie Pratt, Peterson expressed ongoing interest in pursuing a consulting position with the Cleveland office of the FRB, so Pratt worked with Andre Bryan from BPG to create a statement of work for the FRB that would create a new role for Peterson: "SAFe Scrum Master Coach."  (Doc. No. 26-1, ¶ 29.)  According to Abbie Pratt, Peterson expressed interest in this new position which would require her "to perform direct training and supervisory activities for the 6 Cleveland teams with a total of 40-50 Cleveland team members . . . ."  (*Id.*)  According to Abbie Pratt, in October 2021, she arranged several negotiation discussions between Peterson and BPG, and during these discussions, Peterson was informed that this new role required "constant interaction with over 50 Cleveland-based FRB employees and a handful of employees logging in from other states operating within Ohio's time zone, that are tied into the Cleveland directory and reporting structure in Ohio." (Doc. No. 26-1, ¶ 31.)  Pratt avers that Peterson agreed to work as a coach for the Cleveland FRM's T2C project, specifically in a role titled SAFe Agile Scrum Master and Coach for Cleveland-T2c.  (*Id.*)

Peterson avers that she spoke with Pratt on or around October 20, 2021, at which time she was offered an engagement "to serve as a team lead for BPG."  (Doc. No. 15-3, ¶ 7.)  Peterson avers that this engagement was different than the software process coaching position initially contemplated when she applied in June 2021.  (*Id.*)  Peterson agrees that she served as a "Scrum Master" for

"certain teams" within the FRB.  (Doc. No. 23-1, ¶ 8.)  According to Peterson, her team members "were located around the United States in addition to Cleveland."  (*Id.*)

Just prior to Peterson executing her consulting agreements with Pratt, Peterson allegedly requested that Pratt bill Peterson's time through a company called Alshaw Technologies.  (Doc. No. 1, ¶ 21.)  Alshaw Technologies is a Delaware corporation with its principal place of business in Nebraska.  (Doc. No. 1, ¶ 7.)  Alshaw was founded in 1996 as a government contracting company.  (*Id.* at ¶ 20.)  Peterson is Alshaw's president, sole owner, and sole employee.  (Doc. No. 15-3, ¶ 2.)  Alshaw is not registered in Ohio as a foreign corporation.  (Doc. No. 15-3, ¶ 5.)  Alshaw does not maintain an office or employ any person within Ohio.  (*Id.*)  Peterson avers that she never traveled to Ohio, either in connection with the matters alleged in this lawsuit, or in connection with any other project.  (*Id.*)  Nearly all of Alshaw's work is performed in Papillion, Nebraska because Peterson works remotely, rather than reporting in person to a client's place of business.  (*Id.* at ¶ 6.)

According to Pratt, Peterson did not disclose Alshaw "until the time of signature."  (Doc. No. 1, ¶ 21.)  However, "[a]fter assurances from Peterson, AB Pratt eventually accommodated Alshaw, but both Peterson and Alshaw executed contracts that secured the AB Pratt Proprietary Information."  (*Id.*)  Pratt alleges that Peterson concealed her actual designation as Alshaw's founder and Chief Executive Officer until immediately prior to executing the Consulting Agreement because Peterson knew that it would "limit her chance of getting a contract with AB Pratt for FRB since AB Pratt only does business with qualified individual consultants and Alshaw is a direct competitor for AB Pratt and BPG."  (*Id.* at ¶ 20.)

On November 2, 2021, Peterson executed two agreements with Pratt.  First, Peterson, on behalf of Alshaw, executed an "A.B. Pratt & Company Consulting Agreement."  (Doc. No. 15-3, ¶

8.)  The Consulting Agreement specified Alshaw's, and therefore Peterson's, responsibilities on the

FRB project.  (*Id.*)  The Consulting Agreement provided that the client was the "Federal Reserve

Bank."  (Doc. No. 15-4, PageID# 239.)  The Consulting Agreement specified that Peterson's position

was a "Remote Position," and included the following relevant provisions:

> 1. Lisa is available for 40/hrs a week. This position is remote with the client teams
> based in Ohio and various other locations within the United States. Lisa is also
> available for remote meetings and conference calls with Client teams. The core
> working hours will be established by Client Supervisor or Agile teams, when the
> project begins. Lisa is responsible for other equipment required to work from the
> remote location. Client will provide the laptop and security software. Lisa should NOT
> make travel arrangements or purchase project equipment that requires Client re-
> imbursement, without prior approval from Client.
>
> . . .
>
> 3. This engagement is for the Federal Reserve Client in partnership with Bridgeport
> Group to enable seamless security integration for the Federal project teams involved.
> Lisa will coordinate the background checks and secure communication needed within
> Federal Reserve as part of the onboarding process. Lisa will be required to have an
> additional Bridgeport email in addition to a Federal Reserve email to securely perform
> the onboarding tasks listed. Lisa will work closely with Andre from Bridgeport Group
> to ensure that the statement of work (SOW) is executed in accordance with the
> expectations of the Federal Reserve Bank.
>
> 4. Lisa's Point of Contact - Abbie P will be the on-going point of contact for all
> contract, payment, compensation, project terms and any onboarding related questions.
> Peter is the main contact for all project specific questions. Andre from Bridgeport will
> be the key liaison and program lead for the Federal Stakeholders supervising Agile
> Team Scrum Coaches and Staff. Lisa will work directly with Federal Reserve teams
> to complete background check and screening due to security requirements.

(*Id.* at PageID# 239-40.)

Second, Peterson executed a Non-Disclosure and Non-Solicitation Agreement.  (Doc. No. 15-

3, ¶ 11; *see also* Doc. No. 15-5.)  Both the Consulting Agreement and Non-Disclosure and Non-

Solicitation Agreement are governed by Illinois law.  (Doc. No. 15-4, PageID# 238; Doc. No. 15-5,

PageID# 244.)

8

After Peterson executed these agreements, she worked with Pratt to complete her FRB onboarding, including obtaining an FRB laptop shipped from the FRB's Cleveland, Ohio office to Peterson's home in Nebraska.  (Doc. No. 26-1, ¶ 35.)  According to Abbie Pratt, she had several discussions with Peterson and the Cleveland, Ohio teams about the shipment and delivery of FRB's office equipment, including the FRB's secure token, authenticator, tracking device, and laptop, that Peterson was required to use to provide her consulting services to the Cleveland teams.  (*Id.*)

Once Peterson began working with the FRB, she submitted timesheets to Pratt.  (*See* Doc. No. 23-1, ¶ 5; Doc. No. 26-1, ¶ 40-41, Exs. 37, 41.)  Abbie Pratt appended several of these timesheets to her initial Declaration.  (*See* Doc. No. 22-2, PageID# 391-95, 400-08.)  One such time sheet notes that the FRB assigned seven Cleveland teams to Peterson: Team Shield DSU, Team Qubits, Team A, Team JARVIS, Team Scrum Force One, Team Connect, and Team Thundercats.  (*Id.* at PageID# 400.)  Peterson's timesheets reflect that she worked closely with these teams.  For example, on January 31, 2022, Peterson reported that she spent eight hours performing the following work: "Facilitated in Team Jarvis Backlog Refinement, facilitated Team Jarvis Spring Review preparation, completed updates to Team Jarvis PI10 planning page to align with Spring review, participated in Scrum Force One Backlog refinement."  (*Id.* at PageID# 392.)  Likewise, on May 2, 2022, Peterson reported that she spent eight hours performing the following work: "Facilitated Team Shield DSU, Facilitated Team QuBits DSU, Facilitated Team Shield Backlog Refinement, participated in discussion regarding Defect Management Process, worked with Teams to update planning pages and prepare for Sprint Review, worked with Team QuBits to update planning pages and prepare for Spring Review, facilitated continuation of Team QuBits chartering."  (*Id.* at PageID# 401.)  Peterson also virtually attended periodic Cleveland-based "All Hands, team and Town Hall meetings" via

Microsoft Teams.  (Doc. No. 23-1, ¶ 7.)  According to Abbie Pratt, Peterson performed approximately 1,400 hours of consulting work through BPG for the FRB's Cleveland office between December 2021 and June 2022.  (Doc. No. 22-2, ¶ 29.)

### 3. Termination of BPG's and the Peterson Defendants' Contracts

On May 27, 2022, BPG issued a purported contract termination notice to Pratt.  (Doc. No.1, ¶ 23.)  Pratt alleges that BPG refused to follow the contract exit termination process, including refusing to hand over confidential information or release Pratt's staff from the FRB project.  (*Id.*) Instead, BPG announced that business would continue as usual, with Pratt staff working full time for FRB through BPG.  (*Id.*)  Pratt alleges that BPG and VN encouraged Pratt consultants to breach their contractual obligations to Pratt and ignore cease and desist letters sent by Pratt's legal teams.  (*Id.*) Pratt alleges that this wrongful termination caused it to lose four training consultants that would otherwise have been able to begin new client assignments for Pratt.  (*Id.*)

Pratt alleges that the Peterson Defendants "immediately leveraged" BPG's wrongful termination by "directly soliciting and discussing potential work opportunities with FRB."  (*Id.* at ¶ 24.)  BPG notified Pratt of Peterson's violation and insisted that Peterson wrongfully solicited FRB, which negatively impacted BPG's relationship with FRB.  (*Id.*)  Pratt sent the Peterson Defendants a Cease and Desist letter in June 2022, due to Peterson's alleged unlawful dissemination of confidential information.  (*Id.*)  However, Peterson allegedly ignored Pratt's Cease and Desist Letter and "worked in concert with VN and BPG, undercutting AB Pratt by receiving payment directly from VN through BPG for services performed" while still completing work assigned by Pratt.  (*Id.*)

10

**B.      Procedural History**

Pratt filed the instant Complaint on September 7, 2022.  (Doc. No. 1.)  Relevant to the instant Motions, Pratt brought six claims against the Peterson Defendants: Count 5, breach of contract by Peterson – failure to discontinue work for FRB; Count 6, breach of contract by Peterson – fraud and misrepresentation; Count 7, breach of contract by Peterson – misuse of Pratt's proprietary information; Count 8, tortious interference with Pratt's BPG contract by Peterson; Count 9, breach of contract by Alshaw – wrongfully accepting business with BPG; and Count 10, breach of contract by Alshaw – misuse of Pratt's proprietary information.  (*Id.* at ¶¶ 57-85.)

BPG and VN (collectively, "the BPG Defendants") filed their Answer and Counterclaims against Pratt on October 31, 2023.  (Doc. No. 13.)  The BPG Defendants asserted four counterclaims against Pratt: Counterclaim 1, unjust enrichment; Counterclaim 2, breach of contract; Counterclaim 3, tortious interference with contractual relationships; and Counterclaim 4, violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

Also on October 31, 2023, the Peterson Defendants filed the instant combined Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim Or, Alternatively, Motion to Transfer Venue.  (Doc. No. 15.)  Pratt filed an Opposition to the Peterson Defendants' Motion on November 30, 2022.  (Doc. No. 22.)  Pratt attached the declaration of its president, Abbie Pratt, to its Opposition.  (Doc. No. 22-2.)  On December 14, 2022, the Peterson Defendants filed both their Reply in Support of their Combined Motion and a Motion to Disregard and/or Strike Portions of the Declaration of Abbie Pratt.  (Doc. Nos. 23, 24.)  On December 28, 2022, Pratt filed both an Opposition to the Peterson Defendants' Motion to Strike and a Motion to File Surreply in Opposition to the Peterson Defendants' Reply.  (Doc. Nos. 25, 26.)  The Peterson Defendants filed an Opposition to

Pratt's Motion to File Surreply on January 11, 2023. (Doc. No. 29.) Thus, these Motions—the Combined Motion to Dismiss and/or Transfer Venue, the Motion to Strike, and the Motion to File Surreply—are now ripe and ready for a decision.

Additionally, on November 21, 2022, Pratt filed a partial Motion to Dismiss the BPG Defendants' Counterclaims 2 through 4. (Doc. No. 19.) The BPG Defendants did not file an Opposition to Pratt's Motion to Dismiss. Thus, Pratt's Motion to Dismiss is also ripe and ready for a decision.

## II. Peterson Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

### A. Legal Standard

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, "[t]he party seeking to establish the existence of personal jurisdiction bears the burden to establish such jurisdiction, 'over each defendant independently.'" *Beydoun v. Wayaniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014) (quoting *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006)). If a court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction prior to trial, "it has the discretion to adopt any of the following courses of action: (1) determine the motions based on affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005). "[T]he decision whether to grant discovery or an evidentiary hearing before ruling on a 12(b)(2) motion is discretionary." *Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 434 (6th Cir. 2006).

12

In the instant case, neither party indicates a hearing is necessary.  Having reviewed the parties' briefs and declarations attached thereto, the Court concludes that a hearing will not assist the Court and the Peterson Defendants' Motion may be resolved by the parties' submissions.

Where, as here, the district court rules on a jurisdictional motion to dismiss made pursuant to Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff.  *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).  To defeat such a motion, a plaintiff need only make a *prima facie* showing of jurisdiction, which can be met by "establishing with reasonable particularity sufficient contacts between [the defendants] and the forum state to support jurisdiction."  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (quoting *Provident Nat'l Bank v. Cal. Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)).   A court disposing of a Rule 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal but may consider a defendant's undisputed factual assertions.  *See CompuServe*, 89 F.3d at 1262; *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991); *NTCH-West Tenn, Inc. v. ZTE Corp.*, 761 F. App'x 485, 488 (6th Cir. 2019). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff [] alleges collectively fail to state a *prima facie* case for jurisdiction."  *CompuServe*, 89 F.3d at 1262; *see also Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997).

"In a diversity case, a federal court can exercise personal jurisdiction over a defendant if jurisdiction is (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment."  *Tharo Systems, Inc. v. Cab Producktechnik GMBH & Co., KG*, 196 F. App'x 366 (6th Cir. 2006).  Jurisdiction under Ohio's long-arm statute is governed by Ohio Rev. Code § 2307.382 and the due process inquiry requires determining "whether

13

the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *Theunissen*, 935 F.2d at 1459 (quoting *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316, (1945)).

### B. Analysis

In its Complaint, Pratt alleges that this Court has personal jurisdiction over the Peterson Defendants because they purposely availed themselves of an Ohio forum by acting in concert with Ohio Defendants BPG and VN in committing breaches of contract and certain tortious acts in Ohio, as described throughout its Complaint. (Doc. No. 1, ¶ 7.)

The Peterson Defendants argue that this Court lacks specific personal jurisdiction over them because (1) Pratt cannot establish a *prima facie* case that the Peterson Defendants transacted business in Ohio, (2) Pratt cannot otherwise establish that any other subsection of Ohio's long-arm statute applies, (3) Pratt cannot demonstrate that the Peterson Defendants purposely availed themselves of an Ohio forum, (4) Pratt's claims do not arise from any contact between the Peterson Defendants and Ohio, and (5) exercising specific personal jurisdiction over the Peterson Defendants would be unreasonable. (Doc. No. 15-1, PageID# 174-81.)

Pratt argues that the Court has specific personal jurisdiction over the Peterson Defendants because (1) the relevant facts show that the Peterson Defendants had extensive and consistent contacts with Ohio and transacted business within Ohio, as that term is understood under Ohio's long-arm statute, (2) the Peterson Defendants purposely availed themselves of an Ohio forum via virtual contacts, (3) Pratt's claims against the Peterson Defendants arise from their activities in Ohio, and

14

(4) exercising personal jurisdiction over the Peterson Defendants is reasonable.  (Doc. 22, PageID# 295-300.)

### 1.  Ohio's Long-Arm Statute

The Ohio General Assembly amended Ohio's long-arm statute in April 2021 to extend the reach of Ohio's long-arm statute to the limits of the U.S. Constitution.  Before the amendment, "Ohio's long-arm statute consisted of a list of enumerated acts set forth in § 2307.382(A), followed by an admonition in § 2307.382(C) that '[w]hen jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.'"  *AmaTech Grp. Ltd. v. Fed Card Servs., LLC*, 2022 WL 44674, at *4 (S.D. Ohio Jan. 5, 2022) (quoting Ohio Rev. Code Ann. § 2307.382 (West 2019)).  Based on that language, "courts routinely noted that Ohio's long-arm statute did not extend jurisdiction to the fullest extent that the Due Process Clause allows."  *Id.*  The amendment, however, revised subsection (C) to read: "In addition to a court's exercise of personal jurisdiction under subsection (A) of this section, a court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution."  Ohio Rev. Code § 2307.382(C).

Since the amendment, neither the Supreme Court of Ohio nor any Ohio appellate court has addressed the effect of this new language.  *See Goddard v. Goddard*, 195 N.E.3d 1106, 1110 (Ohio Ct. App. 2022) (11th Dist.) (not addressing amendment, conducting two-step analysis of personal jurisdiction: (1) whether Ohio's long-arm statute confers jurisdiction; and (2) whether the exercise of jurisdiction comports with due process); *St. Clairsville Pointe, Inc. v. Musilli*, 193 N.E.3d 1114, 1119-120 (Ohio Ct. App. 2022) (7th Dist.) (same); *Magnum Asset Acquisition, LLC v. Green Energy Techs., LLC*, 2022 WL 2379418, at *1-2 (Ohio Ct. App. June 30, 2022) (9th Dist.) (same); *LG Chem,*

*Ltd. v. Goulding*, 194 N.E.3d 355, 358 (Ohio 2022) (same); *Ricker v. Mercedes-Benz of Georgetown*, 191 N.E.2d 1179, 1187-88 (Ohio Ct. App. 2022) (10th Dist.) (same); *Cincinnati Ins. Co. v. LOMC LLC*, 2022 WL 871128, at *4 (Ohio Ct. App. Mar. 21, 2022) (7th Dist.) (same); *Adamski v. Adamski*, 2022 WL 71874, at *4 (Ohio Ct. App. Jan. 7, 2022) (6th Dist.) (same); *Heredia Realty, LLC v. Harvey*, 182 N.E.3d 362, 367 (Ohio Ct. App. 2021) (1st Dist.) (same); *Ceculski v. Clatterbuck*, 2021 WL 1424195, at *2 (Ohio Ct. App. 2021 (5th Dist.) (same).

Several federal district courts, however, have interpreted the amendment and the courts disagree as to the effect of the amendment. Some courts "have concluded that Ohio's long-arm statute now extends personal jurisdiction to the fullest extent that the U.S. Constitution permits." *AmaTech Grp. Ltd.*, 2022 WL 44674, at *5; *see e.g.*, *Bren Ins. Servs., Inc. v. Envision Pharm. Servs., LLC*, 2022 WL 5160716, at *3 (N.D. Ohio Oct. 5, 2022) ("[T]he Ohio General Assembly extended Ohio's long-arm statute to the limits of the United States Constitution."). Other courts "have concluded that the purpose of the new language in § 2307.382(C) is merely to allow for 'general jurisdiction' over non-resident defendants in appropriate circumstances." *AmaTech Grp. Ltd.*, 2022 WL 44674, at *5; *see e.g.*, *Spyglass Grp., LLC v. Genesis Health Clubs Mgmt., Inc.*, 2022 WL 17251820, at *4 (N.D. Ohio Nov. 28, 2022) ("This amended language appears to allow the exercise of general jurisdiction over non-resident defendants where the Constitution permits. But it does not collapse the specific-jurisdiction analysis into a single due-process inquiry.") (citations omitted).

Because it is unclear whether Ohio's long-arm statute is coterminous with federal constitutional limits, the Court will separately analyze jurisdiction under both Ohio's long-arm statute and the Due Process Clause. *See EHPLabs Research, LLC v. Smith*, 2022 WL 3139604, at *4 (Aug. 5, 2022). "After all, the statute on its face still contains the list of nine enumerated bases for exercising

16

personal jurisdiction over an out-of-state defendant." *Spyglass Grp., LLC*, 2022 WL 17251820, at *4.

Under Ohio Rev. Code § 2307.382: "(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's: (1) Transacting any business in this state . . . ." Ohio Rev. Code § 2307.382. The Ohio Supreme Court has stated that Ohio Rev. Code § 2307.382(A)(1) is "very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio." *Muzzin v. Brooks*, 859 N.E.2d 584, 588 (Ohio Ct. App. 8th Dist. 2006); *see also Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (Ohio 1990); *Dayton Superior Corp. v. Yan*, 288 F.R.D. 151, 160 (S.D. Ohio 2012). The Supreme Court of Ohio has further explained:

> "Transact," as defined by Black's Law Dictionary (5th ed. 1979) 1341, "means to prosecute negotiations; to carry on business; to have dealings [ ]. The word embraces in its meaning the carrying on or prosecution of business negotiations but it is a broader term than the word 'contract' and may involve business negotiations which have been either wholly or partly brought to a conclusion[ ]."

*Ky. Oakes Mall Co.*, 559 N.E.2d at 480; *see also Int'l Paper Co. v. Goldschmidt*, 872 F. Supp. 2d 624, 629 (S.D. Ohio 2012); *The RightThing, LLC v. Brown*, No. 3:09-CV-135, 2009 WL 249694, at * 3 (N.D. Ohio Feb. 2, 2009).

When interpreting Ohio's long-arm statute, federal courts within this Circuit have found that "while the mere existence of a contract may not be enough to confer personal jurisdiction [under Section (A)(1)], a contract may qualify as transacting business under Ohio's long-arm statute, particularly when it imposes continuing obligations on the parties affecting the State of Ohio." *Tarkett USA, Inc v. Harnix Corp.*, No.1:16-CV-2400, 2017 WL 2443139, at * 3 (N.D. Ohio June 6, 2017); *see also Alloy Bellows & Precision Welding, Inc. v. Cole*, No. 1:15-CV-494, 2015 WL

6964579, at * 3 (N.D. Ohio Nov. 10, 2015). Moreover, the Ohio Supreme Court has noted that "personal jurisdiction does not require physical presence in the forum state." *Goldstein v. Christiansen*, 638 N.E.2d 541, 544 (Ohio 1994).

Under the language of Ohio's long-arm statute, Pratt must also show that the case deals with a "cause of action arising from" the business transacted in Ohio. *See* Ohio Rev. Code § 2307.382(A)(1); *Brunner v. Hampson*, 441 F.3d 457, 466 (6th Cir. 2006).

The Peterson Defendants argue that Ohio's long-arm statute does not authorize exercising personal jurisdiction over them because the Peterson Defendants did not transact business in the state of Ohio.[2] First, the Peterson Defendants assert that they are located in Nebraska while Pratt is in Illinois. (Doc. No. 15-1, PageID# 175.) Therefore, the Peterson Defendants argue, no "reaching out" or negotiation took place in the state of Ohio. (*Id.*) Next, the Peterson defendants argue that Alshaw is not registered in Ohio, and does not maintain an office or employees in Ohio. (*Id.*) Finally, the Peterson Defendants emphasize that their work was performed entirely remotely from Nebraska and that Peterson never traveled to or worked in Ohio at any point in time for this, or any other, project. (*Id.*) The Peterson Defendants emphasize that all of Peterson's communications with FRB employees took place remotely via the Microsoft Teams videoconferencing platform. (*Id.*)

Pratt argues that the phrase "transacting any business" within Ohio Rev. Code § 2307.382(A)(1) is broadly defined and that the Peterson Defendants' work with Pratt, BPG, VN, and the FRB easily satisfies this definition. (Doc. No. 22, PageID# 295.) Pratt argues that the Peterson Defendants' regular communications and work with Ohio-based employees satisfies the

---

[2] Though the Peterson Defendants proffer other arguments under other subsections of Ohio's long-arm statute, Pratt only argues that the Peterson Defendants transacted business in Ohio, pursuant to Ohio Rev. Code § 2307.382(A)(1). Thus, the Court need not address the Peterson Defendants' arguments regarding § 2307.382(A)(2)-(4), or (6).

18

statute.  (*Id.*)  Pratt argues that the Peterson Defendants need not maintain a physical presence in Ohio to transact business here, so long as they had sufficient and continuous business dealings in Ohio, including via electronic means.  (*Id.* at PageID# 296.)  Moreover, Pratt asserts that the Peterson Defendants' connection to Ohio is even stronger because Peterson used an office laptop, tracking device, token, and email address shipped from the FRB in Ohio to Nebraska.  (*Id.*)

Construing the facts in Pratt's favor, the Court holds that the Peterson Defendants "transact[ed] . . . business" in Ohio.  Section (A)(1) confers jurisdiction over non-resident defendants that are "transacting any business in Ohio," which the Ohio Supreme Court has explained is "very broadly worded" and contemplates "having dealings" within the state.  *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73, 559 N.E.2d 477 (1990)); *see also Dugger v. Honeywell Int'l, Inc.*, No. 1:21-cv-00892, 2021 WL 5961624, at *5 (N.D. Ohio Dec. 16, 2021) (concluding that a Texas-based defendant transacted business in Ohio by remotely supervising a subordinate's Ohio-based work activities).

In *Dugger v. Honeywell Int'l, Inc.*, the plaintiff, an Ohio resident, sued her company and supervisor for employment discrimination.  *Dugger v. Honeywell Int'l, Inc.*, No. 1:21-cv-00892, 2021 WL 5961624, at *1 (N.D. Ohio Dec. 16, 2021).  The plaintiff worked in the defendant-company's Ohio office, but her supervisor was based in Texas.  *Id.*  The defendant-supervisor moved to dismiss the plaintiff's claims against him on the basis that the court lacked personal jurisdiction over him.  *Id.* at *2.  The court denied the defendant-supervisor's motion to dismiss.  *Id.* at *5.  The district court concluded personal jurisdiction existed over the Texas-based defendant because he had "sufficient and continuous business dealings in Ohio by remotely supervising" the Ohio-based plaintiff by largely electronic means.  *Id.*

19

The Court concludes that Pratt has sufficiently alleged that the Peterson Defendants transacted business in Ohio.  Specifically, Abbie Pratt averred that Peterson provided over 1,400 hours of consulting work for FRB's Cleveland branch between December 2021 and June 2022.  (Doc. No. 22-2, ¶ 29.)  According to the timesheet that Peterson sent to Pratt, Peterson was responsible for supervising at least six different "Cleveland teams" at a time, and each of these teams was comprised of 5 to 10 employees.  (*Id.* at ¶ 26, Exs. D, E, F, H.)    Peterson's role within the FRB's Cleveland T2C project required Peterson to engage in direct training, coaching, performance assessments, meeting planning and facilitating, and receiving and uploading task assignments from Cleveland leadership, "including performing supervisory monitoring of her teams using FRB's secure Microsoft Team[s] platform."  (Doc. No. 26-1, ¶ 32.)  Peterson's timesheets reflect that she typically spent eight hours a day facilitating, supervising, and coordinating a variety of meetings and "scrums" with her Cleveland-based teams.  (*See* Doc. No. 22-2, Ex. H, PageID# 400-01.)  Indeed, the timesheets indicate that managing these teams required "[i]ntense collaboration . . . with teams via video conferencing, demo, training, and onsite leadership summit" and that "[p]articipation in All  hands-on Employee meetings is required."  (*Id.* at Ex. D, PageID# 379.)  Additionally, the FRB shipped a laptop and other electronic devices from its Cleveland office to Peterson in Nebraska so that she could complete her consulting work.  (Doc. No. 26-1, ¶ 35.)  Peterson held a leadership role in which she conducted a variety of managerial and coaching-related tasks on a daily basis, including monitoring her teams' performance, training and coaching dozens of team members, and conducting meetings via electronic means for six months.  The Court concludes this is sufficient to demonstrate that the Peterson Defendants transacted business in Ohio.

Moreover, Peterson's own affidavits support this conclusion.  Peterson admitted that her client teams would be "*based in Ohio* and various other locations," that she "communicated with project supervisors in Ohio remotely—over the Microsoft Teams online platform," and that her team members were located in Cleveland, among other locations.  (Doc. No. 15-3, ¶¶ 10, 15, emphasis added; Doc. No. 23-1, ¶ 8.)  Peterson also admitted that she virtually attended the FRB's Cleveland-based all-hands, team, and town hall meetings via Microsoft Teams.  (Doc. No. 23-1, ¶ 7.)  The broad statutory language—"transacting any business"—encompasses the Peterson Defendants' actions described above, as they maintained continuous business dealings in Ohio for several months.  Ohio Rev. Code § 2407.382(A)(1); *see Ky. Oaks Mall Co.*, 559 N.E. 2d at 480.

The Peterson Defendants' arguments to the contrary are not persuasive.  The Peterson Defendants assert that "multiple courts have found that telephone calls and e-mails sent to Ohio from outside the state do not constitute transacting business in Ohio."  (Doc. No. 23, PageID# 413.)  However, the Peterson Defendants' cited authorities are distinguishable.  For example, in *McMunigal v. Bloch*, the district court concluded that mere communications from a California-based law professor to an Ohio-based law professor who each agreed to contribute separate chapters for a legal textbook were insufficient to constitute transacting business within the meaning of Ohio's long-arm statute.  *McMunigal v. Bloch*, No. 1:09-cv-01674, 2010 WL 2106186, at *4 (N.D. Ohio May 25, 2010).  Here, Peterson did more than place a few phone calls to Ohio-based workers.  Unlike in *McMunigal*, Peterson was responsible for leading at least six different Ohio-based FRB teams and supervising Ohio-based team members' work throughout her consulting engagement.  (Doc. Nos. 15-3, ¶ 15; 23-1, ¶¶ 7-8; 26-1, ¶ 32.)  Further, Peterson maintained continuous business dealings in Ohio by leading, facilitating, and coaching Ohio-based employees' work activities for eight hours a day

21

for nearly six months.  (*Id.*; *see also* Doc. No. 22-2, ¶ 25.)    There were no such allegations in *McMunigal*.

The Court is also not persuaded by the Peterson Defendants' argument that the Court cannot exercise personal jurisdiction over them because neither they nor Pratt are physically located in Ohio. As noted above, Ohio law is clear that "[a] non-resident defendant 'need not 'have a physical presence in Ohio' to be transacting business there.'"  *Olin-Marquez v. Arrow Senior Living Mgmt., LLC*, 586 F.Supp.3d 759, 768 (S.D. Ohio 2022) (quoting *Ohio Valley Bank Comp. v. MetaBank*, No. 2:19-cv-191, 2019 WL 4574528, at *4 (S.D. Ohio Sept. 20, 2019)); *see also Goldstein*, 638 N.E.2d at 544. The Peterson Defendants' work was focused entirely on leading the daily activities and workflows of at least six different Ohio-based teams for the FRB's Ohio branch.  *See supra*.  That the Peterson Defendants performed this work remotely from Nebraska is ultimately of no moment, due to the frequency and regularity with which the Peterson Defendants performed work that affected Ohio citizens.  *See The Rightthing, LLC*, 2009 WL 249694 at *3 ("Electronic transactions from one state into another are not immune from a court's consideration when determining personal jurisdiction."). Moreover, the FRB shipped the Peterson Defendants certain pieces of electronic equipment so that the Peterson Defendants could access the FRB's systems and perform their remote work.  This further demonstrates that the Peterson Defendants were engaged in continuous, Ohio-based business dealings with the FRB because the Peterson Defendants were reliant on the FRB's equipment to perform their work.  *Id.*  Accordingly, the Court concludes that the Peterson Defendants' actions constituted "transacting business" in Ohio.

## 2.     Due Process Clause

As an initial matter, the Court limits its analysis to the question of whether Pratt has made a *prima facie* showing of specific jurisdiction over the Peterson Defendants.  "Personal jurisdiction falls into two categories: general and specific."  *Malone v. Stanley Black & Decker, Inc.,* 965 F.3d 499, 501 (6th Cir. 2020) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  As the Sixth Circuit has explained,

> Personal jurisdiction comes in two flavors: "general" jurisdiction, which depends on a showing that the defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant, and "specific" jurisdiction, which exposes the defendant to suit in the forum state only on claims that "arise out of or relate to" a defendant's contacts with the forum.

*Kerry Steel*, 106 F.3d at 149 (quoting *Helicopteros Nacionales de Colombia S.A., v. Hall*, 466 U.S. 408, 414-15 & fns. 8-10 (1984)).  Here, there is no dispute that the Peterson Defendants are not subject to general jurisdiction in Ohio, and the Court need only consider whether they are subject to specific personal jurisdiction.

The Sixth Circuit has established the following three-part test for determining whether specific personal jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc*., 89 F.3d at 1263; *see also Calphalon v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000); *S. Mach. Co. v. Mohasco Indus*., 401 F.2d 374, 381 (6th Cir. 1968).

The question of whether a defendant has purposefully availed itself of the privilege of doing business in the forum state is "the *sine qua non* for *in personam* jurisdiction."  *Mohasco Indus*., 401

23

F.2d at 381-82; *see also Calphalon*, 228 F.3d at 721 ("The purposeful availment prong . . . is essential to a finding of personal jurisdiction."). The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State," and when the defendant's conduct and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985) (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994).

Courts require purposeful availment to ensure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King*, 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). In this regard, the Supreme Court has explained that, in examining a defendant's contacts, courts "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). In other words, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with persons affiliated with the State." *Id*. at 286. Notably, in at least one unpublished Sixth Circuit opinion, the court concluded that "the Ohio 'transacting any business' standard is coextensive with the purposeful availment prong of constitutional analysis." *Burnshire Development, LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 432 (6th Cir. 2006).

For specific jurisdiction to attach under the second factor, "the cause of action must arise from the defendant's activities" in the forum state. *Mohasco*, 401 F.2d at 381. "To meet this requirement,

24

a plaintiff must establish at least a 'causal connection' between a defendant's activities in the forum state and the harm to the plaintiff." *Opportunity Fund, LLC, v. Epitome Sys., Inc.*, 912 F. Supp. 2d 531, 540 (S.D. Ohio 2012) (quoting *Neogen*, 282 F.3d at 892). "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *CompuServe*, 89 F.3d at 1267 (citing *Reynolds*, 23 F.3d 1116-17).

Finally, the Court must consider whether exercising personal jurisdiction over Defendants would "comport with traditional notions of fair play and substantial justice." *Id.* at 1267-68 (quoting *Reynolds*, 23 F.3d at 1117). If the Court has found that the first two requirements of the test are met, "an inference arises that this third factor is also present." *Id.* at 1268 (citing *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988)). When deciding this third element, the Court must consider "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Id.* (quoting *Am. Greetings*, 839 F.2d at 1169-70).

The Peterson Defendants argue that, for the same reasons identified in their argument regarding lack of transacting business under Ohio's long-arm statute, the Court should conclude that they did not purposefully avail themselves of the privilege of acting in Ohio. (Doc. No. 15-1, PageID# 179.) They further argue that Pratt cannot demonstrate that its claims arise from any contacts that the Peterson Defendants had with Ohio because neither Pratt nor the Peterson Defendants are based in Ohio, and the end users at the FRB were located in several other states in addition to Ohio. (*Id.* at PageID# 180.) Finally, the Peterson Defendants assert that it would be unreasonable for this Court to exercise jurisdiction over them because it would be a substantial burden on the Peterson Defendants to have to defend an Ohio-based case from Nebraska. (*Id.*)

25

Pratt argues that the Peterson Defendants purposefully availed themselves of the laws of Ohio because they engaged in significant activities within Ohio and created continuing obligations between themselves and Ohio.  (Doc. No. 22, PageID# 297.)  Pratt argues that physical presence in Ohio is not necessary to satisfy this prong, and that the Peterson Defendants' virtual contacts, such as the regular and consistent contact Peterson maintained with FRB personnel, are sufficient to show that they purposefully availed themselves of the laws of Ohio.  (*Id.*)  Pratt further argues that its claims against the Peterson Defendants arise from their activities in Ohio because all of Pratt's claims center on the Peterson Defendants' work for the FRB in Cleveland and their resulting contacts with Ohio. (*Id.* at PageID# 299.)  Finally, Pratt asserts that exercising jurisdiction over the Peterson Defendants would be reasonable because the burden on them, if any, is minimal.  (*Id.* at PageID# 300.)  Moreover, Pratt argues that it has a keen interest in obtaining relief in this Court as it is the only forum in which Pratt may proceed against all defendants.  (*Id.*)

Construing the facts in Pratt's favor, the Court concludes that the Due Process Clause allows for jurisdiction over the Peterson Defendants.  First, the Peterson Defendants purposefully availed themselves of the laws of Ohio when Peterson accepted a Cleveland-based consultant position with the FRB.  Peterson's consulting job required her to manage and lead at least six different Cleveland-based teams, engage with dozens of employees based in Ohio (as well as small number of employees outside of Ohio) for six months, and perform all of her remote work on a laptop shipped to her from Cleveland. This remote working arrangement resulted in an ongoing relationship with Ohio for several months.  *See AlixPartners, LLP v. Brewington*, 836 F.3d 543, 550 (6th Cir. 2016) ("Because Brewington [a Texas-based employee] accepted a job in which his duties were purposefully aimed at, and tied to, Michigan and its residents, Michigan was, at least in part, the focus of Brewington's

26

employment and the parties' relationship."); *see also Dugger*, 2021 WL 5961624, at *7 (noting that "the purposeful availment prong has been deemed satisfied when an out-of-state defendant has a remote working arrangement that results in a connection with the forum state" and concluding that the out-of-state defendant purposefully availed himself of Ohio's laws by creating consistent virtual contacts in the course of supervising one Ohio employee).

Next, Pratt satisfies the second prong of the Due Process Clause analysis. As set forth above, Pratt's claims against the Peterson Defendants arise out of the Peterson Defendants' consulting work for the FRB, which is based in Ohio, as well as the Peterson Defendants' alleged disclosures of Pratt's proprietary information to the FRB, BPG, and VN, all of which are based in Ohio. Contrary to the Peterson Defendants' assertion that Pratt's claims cannot arise out of the Peterson Defendants' conduct because the end users "were located in several other states aside from Ohio," the Consulting Agreement explicitly provides that Peterson's "position is remote **with client teams based in Ohio** and various other locations within the United States." (Doc. No. 15-3, PageID# 269, emphasis added.) It is not mutually exclusive that because the Peterson Defendants' activities *may* have impacted some end-users in other states that their activities *cannot also* affect Ohio. To the contrary, the Consulting Agreement contemplated that there would be end-users located specifically in Ohio. (*Id.*) Moreover, according to Abbie Pratt's Declaration, Peterson reported directly to four FRB senior managers located in Ohio, and more than 50 of Peterson's team members were also based in Ohio. (Doc. No. 22-2, ¶¶ 24-25.) Thus, even though Peterson indicated that she worked with some non-Ohio FRB employees and contractors, it is also clear that she worked with many Ohio-based FRB employees as well.

27

Finally, the Court concludes that Pratt satisfies the third prong.  Because Pratt satisfies the first two elements of the test, there is an inference that the Peterson Defendants have a substantial connection with Ohio.  *CompuServe*, 89 F.3d at 1268.  Exercising personal jurisdiction over the Peterson Defendants comports with traditional notions of fair play and substantial justice.  Though it may be minimally burdensome for Peterson Defendants to defend a suit in Ohio, when they entered into the relevant business relationship to provide consulting services to an Ohio-based entity, they knew that they were "making a connection with Ohio, and presumably [ ] hoped that connection would work to [their] benefit."  *Id.*

Accordingly, the Court concludes that it may exercise jurisdiction over the Peterson Defendants.

## III.    Motion to Strike

Having concluded that it may exercise personal jurisdiction over the Peterson Defendants in this matter, the Court now turns to the remaining motions in this case.  In their Motion to Disregard and/or Strike Portions of Declaration of Abbie Pratt, the Peterson Defendants argue that the Court should disregard and/or strike several paragraphs of Abbie Pratt's Declaration because these paragraphs contain hearsay evidence or evidence outside her personal knowledge.  (Doc. No. 24, ¶ 6.)  The Peterson Defendants claim that Abbie Pratt lacks personal knowledge about Peterson's FRB interview and onboarding process, and that she failed to authenticate certain exhibits related to Peterson's timekeeping.  (*Id.* at ¶¶ 11-12, 25, 27.)  Pratt filed an Opposition and accompanying subsequent declaration by Abbie Pratt, explaining in further detail how she acquired personal knowledge of Peterson's onboarding and timekeeping procedures.  (Doc. Nos. 26, 26-1.)  Abbie Pratt attached several additional exhibits to her supplemental declaration.

28

On its own or upon a motion, a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "A court has broad discretion in determining whether to grant a motion to strike." *McKinney v. Bayer Corp.*, No. 10–CV–224, 2010 WL 2756915, at *2 (N.D. Ohio July 12, 2010). However, "motions to strike are disfavored and granted only where the allegations are clearly immaterial to the controversy or would prejudice the movant." *Frisby v. Keith D. Weiner & Assocs. Co., LPA*, 669 F. Supp. 2d 863, 865 (N.D. Ohio 2009). Although Rule 12(f) only applies to pleadings, a court has "the inherent authority to strike non-pleadings in order to manage its docket." *Taylor v. JP Morgan Chase Bank, N.A.*, No. 3:15-CV-509-HBG, 2018 WL 5777497, at *3 (E.D. Tenn. Nov. 2, 2018).

The Peterson Defendants' Motion to Disregard and/or Strike is denied. Peterson admits in her own supplemental affidavit that she sent timekeeping information to Pratt: "Once Alshaw began its engagement, my only communications with A.B. Pratt & Co. **related to timekeeping** and my COVID vaccination status.". (Doc. No. 23-1, ¶ 5.) Moreover, the Consulting Agreement expressly provides that Abbie Pratt was Peterson's "on-going point of contact for all contract, payment, compensation, project terms and **any onboarding related questions.**" (Doc. No. 15-3, PageID# 270.) Thus the Peterson Defendants' *own filings* demonstrate that Abbie Pratt had personal knowledge about Peterson's FRB onboarding and timekeeping processes.

Additionally, attached to Abbie Pratt's declarations are several e-mail and text message exchanges between Abbie Pratt and BPG and Peterson regarding Peterson's onboarding process (including e-mails in which Abbie Pratt inquires as to the shipping status of Peterson's FRB laptop). (*See* Doc. No. 22-2, PageID# 579-611.) Abbie Pratt also appended e-mails from Peterson in which Peterson confirms sending her timesheets to Pratt for review. (*Id.* at PageID# 621, 635.) Finally,

Abbie Pratt avers in her supplemental declaration that she provided "first level approval of Peterson's hourly activities and timesheets for the Cleveland-T2C project at FRB" and that A.B. Pratt "maintains records of comprehensive project activities that Peterson performed for FRB's Cleveland-T2C project as part of the contractual obligations between AB Pratt and BPG in Ohio." (Doc. No. 26-1, ¶ 41.)  It is clear, based on both the Peterson Defendants' filings, as well as Abbie Pratt's supplemental declaration and exhibits, that Abbie Pratt has sufficient first-hand knowledge of Peterson's onboarding and timekeeping activities.

Moreover, the Peterson Defendants do not support their barebones assertions that Abbie Pratt failed to lay "a foundation to establish that Pratt uses Exhibits D, E or F [to Abbie Pratt's initial Declaration], that they are business records or that she maintains them in the ordinary course of her business," or that she failed to "authenticate the records pursuant to Rule 901 of the Federal Rules of Evidence" with any analysis or argument.  (Doc. No. 24, ¶ 25.)  As discussed above, Abbie Pratt indicated in her supplemental declaration that she conducted the first-level review and approval of Peterson's weekly timesheets to the FRB before sending them on to BPG for review.  (Doc. No. 26-1, ¶¶ 7, 41.)  Thus, Abbie Pratt had personal knowledge of the content of these emails.  Moreover, according to Peterson herself, as well as Peterson's e-mails, Peterson provided her timekeeping information to Abbie Pratt.  (*See* Doc. No. 23-1, ¶ 5.)

Moreover, Abbie Pratt appended multiple e-mails from Peterson by which Peterson sent her timesheets to Pratt for review.  (*Id.* at PageID# 621, 635.)  Thus, the Court is persuaded that Abbie Pratt had sufficient personal knowledge regarding Peterson's timekeeping practices and timesheet submissions to establish that Exhibits D, E, and F were business records maintained in the ordinary course of Pratt's business.

30

The Peterson Defendants' Motion to Strike is denied.

## IV.  Motion to File Surreply

The Court now turns to Pratt's Motion for Leave to File Surreply in Opposition to the Peterson Defendants' Motion to Dismiss.  (Doc. No. 25.)  "Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'"  *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)); *accord Eldridge v. Cardif Life Ins. Co.*, 266 F.R.D. 173, 175 (N.D. Ohio 2010) ("This Court grants leave to file a sur-reply to afford a party an opportunity to address new issues raised for the first time in the reply.").  On the other hand, when a reply does not include new arguments or evidence, a sur-reply is "an impermissible attempt to have the last word."  *Attractive Surgical, LLC v. Cleveland Clinic Found.*, No. 1:19 CV 1212, 2019 WL 11075734, at *4 (N.D. Ohio Oct. 31, 2019).

Pratt argues that it should be permitted to file its proposed sur-reply to address various "contradictions and inconsistencies" in Peterson's supplemental affidavit.  (Doc. No. 25, PageID# 496.)  The Peterson Defendants argue that Peterson's assertions in her initial affidavit and supplement affidavit are not inconsistent.  (Doc. No. 29, PageID# 783; *compare* Doc. No. 15-3 *with* Doc. No. 23-1.)

The Court agrees with the Peterson Defendants that Peterson's assertions as set forth in her initial and supplemental affidavits are not inconsistent.  For example, Pratt argues that it should be permitted to respond to the supposed "discrepancy" between Peterson's initial claim that she accepted a role as a team lead for BPG and her subsequent "concession" that she accepted a role as Scrum

31

Master for certain FRB teams. (Doc. No. 25, PageID# 496.) These averments do not conflict with one another, though Peterson's supplemental affidavit is more specific about her job title. Additionally, the Consulting Agreement clearly indicates that Peterson would perform the job of "Sr Agile Scrum Coach, Scrum Master and Mentor" and Pratt alleges that it provided consulting services through BPG to the FRB. (Doc. No. 15-4, PageID# 269; Doc. No. 1, ¶ 3.) Due to the convoluted nature of the various agreements between BPG, Pratt, FRB, and the Peterson Defendants, the Court sees no discrepancy between Peterson's initial averment that she accepted a role as a team lead for BPG and her subsequent averment that she accepted a role as a Scrum Master for certain FRB teams. Both amount to the same thing: Peterson and Pratt agreed that Peterson would work through BPG as a team lead for FRB. Likewise, Pratt's other cited "discrepancies" do not contain any new or conflicting factual averments between Peterson's initial and supplemental affidavits. Instead, the majority of Pratt's proposed sur-reply appears to be an impermissible attempt to have the last word regarding the parties' dispute over personal jurisdiction. (*See* Doc. No. 25-1, PageID# 502-07.) Accordingly, the Court will not consider Pratt's proposed sur-reply. Pratt's Motion is denied.

## V.      Motion to Transfer Venue

Alternatively, the Peterson Defendants request that, should the Court find that it has personal jurisdiction over them, the Court transfer venue either to the United States District Court for the District of Nebraska, or for the Northern District of Illinois, pursuant to 28 U.S.C. § 1404(a). (Doc. No. 15-1, PageID# 181.)

### A.      Legal Standard

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might

have been brought or to any district or division to which all parties have consented." When considering a motion brought under 28 U.S.C. § 1404(a), a district court "must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). District courts balance multiple often-competing factors when weighing a motion to transfer venue: the convenience for witnesses, the location of operative facts, the ability to compel unwilling witnesses, the interests of justice, the ease of accessing sources of proof, convenience of the parties, and the plaintiff's choice of forum. See *Means v. United States Conf. of Cath. Bishops*, 836 F.3d 643, 651 (6th Cir. 2016) (declining to reverse the district court's venue decision based on those factors). In weighing these factors, "if a change of venue serves merely to shift the inconvenience from one party to another, a change of venue is generally not warranted." *Siegfried v. Takeda Pharms. N. Am., Inc.*, No. 1:10-cv-02713, 2011 WL 1430333, at *2 (N.D. Ohio Apr. 14, 2011) (citations omitted).

After weighing the relevant factors, the court must then "decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Id.* at 62-63 (quoting 28 U.S.C. § 1404(a)). The party requesting the transfer "bears the burden of proof to show the factors weigh 'strongly' in favor of transfer." *Goodrich Corp. v. Winterthur Int'l Am. Ins. Co.*, No. 5:02CV367, 2002 WL 31833646, at *6 (N.D. Ohio June 17, 2002) (quoting *Picker Int'l, Inc. v. Travelers Indem. Co.*, 35 F. Supp. 2d 570, 573 (N.D. Ohio 1998)).

**B.    Analysis**

The Peterson Defendants argue briefly that transfer to a federal court in either Nebraska or Illinois is warranted because "this matter is at best minimally related to Ohio." (Doc. No. 15-1, PageID# 181.) The Peterson Defendants assert that the Court should give Pratt's choice of an Ohio

33

forum less weight because this forum is not Pratt's residence.  (*Id.*)  The Peterson Defendants also argue that their records and witnesses are in Nebraska and Pratt's records and witnesses are in Illinois, so any burden on Pratt to litigate in Illinois would be nominal, as the Northern District of Illinois is its home forum.  (*Id.*)

Pratt contends that Ohio is the appropriate venue for this matter.  (Doc. No. 22, PageID# 300.) Pratt argues that the Peterson Defendants fail to explain why litigating in Ohio is so burdensome that it warrants a venue transfer.  Pratt argues that the Peterson Defendants' assertion that its records and witnesses are in Nebraska is insufficient to overcome the large measure of deference owed to Pratt's choice of venue.  (*Id.* at PageID# 301.)  Pratt argues that, as a practical matter, parties and courts regularly use technology to conduct all phases of litigation, so the physical location of witnesses and records imposes little burden on conducting a case.  (*Id.*)  Moreover, Pratt asserts, the Peterson Defendants fail to acknowledge that the only relevant witness in Nebraska is Peterson, whereas BPG's, VN's, and the FRB's personnel and documents are in Ohio.  (*Id.*)  Finally, Pratt argues that transferring Pratt's case against the Peterson Defendants to the District of Nebraska or the Northern District of Illinois would be inefficient, as Pratt's case against BPG and VN would remain in this Court.  (*Id.*)  Pratt asserts that creating two parallel matters would result in the duplication of efforts and redundant discovery because these matters involve the same witnesses, documents, and similar claims.  (*Id.*)

The Court concludes that transfer is not warranted in this case.  The Peterson Defendants, as the parties requesting transfer, do not demonstrate that the various factors weigh strongly in favor of transfer.  First, Pratt's choice of venue carries some weight in this analysis.  Pratt was entitled to bring this lawsuit where it wanted, and it chose the Northern District of Ohio.  Although the Peterson

34

Defendants correctly point out that Pratt's choice of venue, as a non-resident plaintiff, carries less weight, Pratt's choice is not entitled to no weight at all. *Signify N.A. Corp. v. Menard, Inc.*, No. 1:22-cv-01447, 2022 WL 17617304, at *3-4 (N.D. Ohio Dec. 9, 2022) (citing *Means*, 836 F.3d at 651). Thus, the Court will weigh Pratt's choice alongside the other factors in its analysis. *Id.*

The Court concludes that proceeding in this district is no more inconvenient for witnesses and/or parties than proceeding in either the District of Nebraska or the Northern District of Illinois. First, the Peterson Defendants do not explain why it would be more inconvenient to proceed here than in the Northern District of Illinois, which is also a foreign venue for the Peterson Defendants. Second, based on the record at this stage of the litigation, most of the relevant witnesses, including BPG's and VN's personnel, as well as non-party FRB's personnel, are located within Ohio. Third, there is no indication that there are copious amounts of physical records in this case. Rather, given the nature of Peterson's remote onboarding and subsequent remote work for the FRB, it appears that the records in this case are electronic and, therefore, easily accessible from any federal district.

Further, Pratt's claims against the Peterson Defendants involve many of the same witnesses and documents as its claims against BPG and VN. (Doc. No. 22, PageID# 301.) The Court agrees with Pratt that splitting this matter into two separate federal cases would indeed "result[ ] in duplication of efforts, redundant discovery and increased burden on third parties." (Doc. No. 22, PageID# 301.) Accordingly, convenience for the witnesses and parties does not favor transfer. Additionally, given the risk of duplicative litigation and redundant discovery if Pratt was required to litigate its separate but related claims in two different federal courts, the interest of judicial economy weighs against transfer.

On balance, none of the factors weigh in favor of transfer.  Pratt's choice of venue and judicial economy weigh against transfer.  The Court concludes that the Peterson Defendants have not shown that the balance of interests strongly favors transfer.  The Peterson Defendants' Motion to Transfer is denied.

## VI.    Motion to Dismiss Counts 5 through 10 for Failure to State Claim

The Peterson Defendants also move to dismiss all five of Pratt's claims against them for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. No. 15-1, PageID# 182.)

### A.    Legal Standard

Under Fed. R. Civ. P. 12(b)(6), the Court accepts Plaintiff's factual allegations as true and construes the Complaint in the light most favorable to Plaintiff.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  To survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  *Bassett v. Nat. Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555-56).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-

36

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."'" *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

**B.     Analysis**

**1.     Adequate Consideration**

In Count 5, Pratt alleges that Peterson breached her contract with Pratt by continuing to provide unauthorized services for FRB using Pratt's confidential information. (Doc. No. 1, ¶¶ 57-59.) In Count 9, Pratt alleges that Alshaw breached its contract with Pratt by pursuing a "business opportunity relat[ed] to" Pratt's business opportunities by continuing to work for the FRB. (*Id.* at ¶¶ 75-78.)

The Peterson Defendants argue that Counts 5 and 9, Pratt's breach of contract claims against Peterson and Alshaw, fail because the non-competition and non-solicitation clauses in the agreements lack sufficient consideration to be enforceable. (Doc. No. 15-1, PageID# 183.) The Peterson Defendants argue that Illinois courts have repeatedly held that at-will employment only constitutes adequate consideration to uphold a restrictive covenant (e.g., a non-competition and/or non-

37

solicitation clause) if the at-will employment lasts for at least two years following execution of the agreement.  (*Id.*)  The Peterson Defendants argue that Pratt cannot contest that its business relationship with the Peterson Defendants lasted far less than one year.  (*Id.*)  Therefore, according to the Peterson Defendants, this short duration of at-will employment is inadequate consideration to support enforcing the Confidentiality and Consulting Agreements' restrictive covenants under Illinois law.  (*Id.* at PageID# 183-84.)

In response, Pratt argues that the pleading stage is too early for a court to rule on the adequacy of consideration because such an analysis is too fact-specific and should be based on the totality of the circumstances.  (Doc. No. 22, PageID# 306.)  Pratt contends that Illinois courts have rejected a bright-line rule that two years is the minimum amount of time required to support adequate consideration for restrictive covenants.  (*Id.*)

Under Illinois law,

Illinois courts abhor restraints on trade. *Prairie Eye Center, Ltd. v. Butler*, 305 Ill.App.3d 442, 445, 239 Ill.Dec. 79, 713 N.E.2d 610 (1999) (citing *Gillespie v. Carbondale & Marion Eye Centers, Ltd.*, 251 Ill.App.3d 625, 626, 190 Ill.Dec. 950, 622 N.E.2d 1267 (1993)). Postemployment restrictive covenants are carefully scrutinized by Illinois courts because they operate as partial restrictions on trade. *Fifield v. Premier Dealer Services, Inc.*, 2013 IL App (1st) 120327, ¶ 13, 373 Ill.Dec. 379, 993 N.E.2d 938 (citing *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill.App.3d 437, 447, 316 Ill.Dec. 445, 879 N.E.2d 512 (2007)). In order for a restrictive covenant to be valid and enforceable, the terms of the covenant must be reasonable. *Prairie Eye Center, Ltd.*, 305 Ill.App.3d at 445, 239 Ill.Dec. 79, 713 N.E.2d 610. It is established in Illinois that a restrictive covenant is reasonable only if the covenant (1) is no greater than is required for the protection of a legitimate business interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 17, 358 Ill.Dec. 322, 965 N.E.2d 393. The courts consider the unique factors and circumstances of the case when determining the reasonableness of a restrictive covenant. *Millard Maintenance Service Co. v. Bernero*, 207 Ill.App.3d 736, 745, 152 Ill.Dec. 692, 566 N.E.2d 379 (1990). **However, before even considering whether a restrictive covenant is reasonable, the court must make two determinations: (1) whether the restrictive covenant is ancillary to a valid contract; and (2) whether**

> **the restrictive covenant is supported by adequate consideration.** *Fifield*, 2013 IL App (1st) 120327, ¶ 13, 373 Ill.Dec. 379, 993 N.E.2d 938 (citing *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill.App.3d 131, 137, 226 Ill.Dec. 331, 685 N.E.2d 434 (1997)). **Absent adequate consideration, a covenant, though otherwise reasonable, is not enforceable.** *Id.* ¶ 14 (citing *Brown & Brown, Inc. v. Mudron*, 379 Ill.App.3d 724, 728–29, 320 Ill.Dec. 293, 887 N.E.2d 437 (2008)); see also *Millard*, 207 Ill.App.3d at 744, 152 Ill.Dec. 692, 566 N.E.2d 379.

*McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1082 (Ill. Ct. App. 2015) (emphasis added). Generally, Illinois courts do not inquire into the adequacy of consideration. *Id.* However, postemployment restrictive covenants are excepted from this general rule "because it has been recognized that a promise of continued employment may be an illusory benefit where the employment is at-will." *Id.* (citing *Fifield*, 2013 IL App (1st) 120327, ¶ 14). Under Illinois law, "continued employment for a substantial period of time beyond the threat of discharge is sufficient consideration to support a restrictive covenant in an employment agreement." *Id.* Generally, Illinois law holds "that continued employment for two years or more constitutes adequate consideration." *Id.*; *see also, e.g., Tekway Inc. v. AT&T Servs., Inc.*, No. 20-C-4095, 2021 WL 916080, at *4 (N.D. Ill. Mar. 10, 2021).

Though Illinois courts have applied a "totality of the circumstances" approach in determining whether postemployment restrictive covenants were supported by adequate consideration, this fact-specific, or totality of the circumstances, approach does not apply in a case where no additional consideration, other than continued employment, was provided. *McInnis*, 35 N.E.3d at 1088; *see also Axion RMS, Ltd. v. Booth*, 138 N.E.3d 6, 15 (Ill. Ct. App. 2019). Indeed, "where no additional compensation, such as a raise or special benefits, is given to the employee, and the employee resigns less than two years after executing the restrictive covenant, the consideration is inadequate and the restrictive covenant is unenforceable." *Axion*, 138 N.E.3d at 15. Thus, when there are no allegations

39

that there has been any consideration other than the continued at will employment, Illinois courts enforce this two year minimum stringently. *Id.*

The Court concludes that counts 5 and 9 fail for lack of consideration. The Peterson Defendants performed services under the Confidentiality and Consulting Agreements from November 2021 through June 2022, a little over six months. (*See* Doc. No. 1, ¶ 58; Doc. Nos. 1-2, 1-3.) The Confidentiality and Consulting Agreements do not indicate that the Peterson Defendants received any additional consideration, other than the continuation of their consulting arrangement, under the contracts with Pratt. Moreover, Pratt does not allege that the Peterson Defendants received any additional consideration under the contract or dispute that the only consideration offered to the Peterson Defendants was continued at-will employment. (*See* Doc. Nos. 1, 22.) In a case such as this, where the only consideration is continued employment, and the employer terminates the contract well before two years, such postemployment restrictive covenants fail for lack of consideration. *See Tekway*, 2021 WL 916080, at *4; *Axion*, 138 N.E.3d at 15; *McInnis*, 35 N.E.3d at 1088.

Pratt's counterarguments are not persuasive. Pratt contends that "inquiries into the reasonableness of restrictive covenants, including adequacy of consideration, are 'fact dependent' and are 'based on the totality of the circumstances,' making them inappropriate for the motion to dismiss stage." (Doc. No. 22, PageID# 306.) However, in Pratt's cited case, *Traffic Tech, Inc. v. Kreiter*, the defendant worked for the plaintiff for more than nine months and received a $250,000 signing bonus (equal to one year's salary). *Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *5 (N.D. Ill. Dec. 18, 2015). Thus, the defendant received additional consideration (i.e., a $250,000 signing bonus) as opposed to merely continued employment.[3] *Id.* The instant dispute is

---

[3] Moreover, the Court notes that the *Traffic Tech* court appeared to rely primarily on the *McInnis* dissent—which opined that a two-year bright-line test should not be applied when determining the adequacy of consideration—but disregarded

40

distinguishable from *Traffic Tech* because Pratt does not allege that the Peterson Defendants received *any* other consideration beyond continued employment, which ultimately lasted for far less time than two years.

Moreover, though Pratt claims that Illinois courts have declined to adopt a "universal, bright-line rule" regarding the adequacy of consideration, Pratt does not acknowledge that *McInnis*, *Axion*, and *Tekway* address a specific scenario: an at-will contract where the *only* consideration for a restrictive covenant is continued employment.  In that narrow situation—like the one at bar—the Illinois appellate courts have concluded that, at the pleading stage, such restrictive covenants are unenforceable due to inadequate consideration.  Accordingly, the Court concludes that Counts 5 and 9 fail as a matter of law for lack of consideration.  The Peterson Defendants' Motion to Dismiss is granted as to Counts 5 and 9.

### 2.      Enforceability of Confidentiality Provisions

In Counts 7 and 10, Pratt alleges that the Peterson Defendants continue to use and disclose Pratt's proprietary information despite contractual obligations not to in the Confidentiality and Consulting Agreements.  (Doc. No. 1, ¶¶ 64-70, 79-85.)

The Peterson Defendants argue that the confidentiality provisions found in the Confidentiality and Consulting Agreements are unenforceable because they do not contain any geographic or temporal limitations and, thus, are void as a matter of law.  (Doc. No. 15-1, PageID# 187.)  In its Opposition, Pratt argues that whether a confidentiality provision is enforceable is a fact issue that cannot be decided at a motion to dismiss stage.  (Doc. No. 22, PageID# 304.)  Further, Pratt argues,

---

the *McInnis* majority's ruling, which sets forth the controlling application of Illinois law.  *See Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *5 (N.D. Ill. Dec. 18, 2015).

even if the Court considered the validity of the confidentiality provisions, its allegations are sufficient to withstand scrutiny under Rule 12.  (*Id.*)

The Peterson Defendants' Motion to Dismiss Counts 7 and 10 is denied.  The Court observes that nearly all of the Peterson Defendants' cited cases are dated prior to 1992.  (Doc. No. 15-1, PageID# 187-88.)  This date is significant because in 1992, the Illinois legislature passed the Illinois Trade Secret Act, which provides that "a contractual duty . . . to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty."  765 ILCS 1065/8(b)(1).  Under Illinois law,

> [p]rior to the enactment of the ITSA, a few cases held that confidentiality agreements would not be enforced unless they contained reasonable temporal or geographic limitations. *E.g., Cincinnati Tool Steel Co. v. Breed*, 136 Ill. App. 3d 267, 482 N.E.2d 170 (2d Dist. 1985). **Section 8(b)(1) of the ITSA superseded and overruled those holdings to the extent they required durational or geographic limits on contractual duties to maintain secrecy or limit the use of trade secrets.** *Abbott Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 22, 619 N.E.2d 1337, 1344 (2d Dist. 1993) (contractual prohibition against trade secret disclosure not invalid because it did not contain time limitation; citing Section 8(b)(1) of ITSA).

*PepsiCo, Inc. v. Redmond*, No. 94-C-6838, 1996 WL 3965, at *26 (N.D. Ill. Jan. 2, 1996) (emphasis added).  Though the ITSA refers to "trade secrets," Illinois courts, and federal courts applying Illinois law, "have applied the statute in considering the validity of contractual provisions that involve both trade secrets **and** confidential information." *Thomas & Betts Corp. v. Panduit Corp.*, No. 93-C-4017, 1999 WL 261861, at *2 (N.D. Ill. Apr. 8, 1999) (citing *Abbott–Interfast*, 619 N.E.2d at 1344). Accordingly, "while some older Illinois cases"—*e.g.*, those cited by the Peterson Defendants—"held that the absence of geographical and durational limitations alone is sufficient to render a restrictive covenant invalid," the ITSA explicitly superseded such cases.  *Id.*; *see also, e.g., PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 n.10 (7th Cir. 1995) ("The confidentiality agreement is also not invalid

for want of a time limitation. *See* 765 ILCS 1065/8(b)(1) . . . ."). Therefore, the Court declines to dismiss Counts 7 and 10 solely because the confidentiality provisions found in the Confidentiality and Consulting Agreements lack geographical and durational limits.

Further, the Peterson Defendants' Motion to Dismiss Counts 7 and 10 also fails because examining whether the at-issue confidentiality provisions are reasonable would require the Court to make fact-based determinations that are not appropriate at the pleading stage. *See Nortek Prods. (Taicang) Ltd. v. FNA Grp., Inc.*, No. 10-C-2813, 2011 WL 2110043, at *4 (N.D. Ill. May 24, 2011). "Restrictive covenants that lack geographic limitations are not *per se* unreasonable in Illinois unless they are beyond the needs of the employer to protect its legitimate business interests." *Id.* (citations omitted). However, "whether such restrictions are reasonable in this case requires the Court to make a fact-based determination that is not appropriate at the motion-to-dismiss stage." *Id.*

Accordingly, the Court concludes that Pratt's allegations of breach of contract against the Peterson Defendants in Counts 7 and 10 do not fail as a matter of law. The Peterson Defendants' Motion to Dismiss is denied as to Counts 7 and 10.

### 3.    Fraudulent Inducement

In Count 6, Pratt alleges that it relied on Peterson's misrepresentations that she was an employee and engineer for "Atech" and needed to provide her employer two weeks' notice prior to resignation, while all along concealing that she was actually the CEO of Alshaw, a competing government contractor. (Doc. No. 1, ¶¶ 61-62.) Pratt alleges that if it was aware of the truth about Peterson's role as CEO of Alshaw, it would never have entered into a contract with her. (*Id.* at ¶ 63.)

Peterson argues that Count 6 should be dismissed because Pratt fails to plead its fraudulent inducement claim with the specificity required under Fed. R. Civ. P. 9. (Doc. No. 15-1, PageID#

188.)  Further, Peterson asserts that Pratt's claim is barred because Pratt's claimed fraudulent inducement damages are "no different" from its breach of contract damages.  (*Id.* at PageID# 188-89.)  Finally, Peterson argues that Pratt's claim that it relied on Peterson's representations is directly undercut by other allegations in the Complaint and the Consulting Agreement itself, as Pratt alleges at the time of signature that Peterson acknowledged her relationship with Alshaw, and that both Peterson *and* Alshaw executed a contract with Pratt.  (*Id.* at PageID# 188-89.)

In its Opposition, Pratt argues that a review of the Complaint indicates that it met its pleading burden under Rule 9.  (Doc. No. 22, PageID# 307.)  Moreover, Pratt argues that it is not barred from alleging that it suffered comparable damages under both its fraud claim and breach of contract claims at the pleading stage.  (*Id.*)  Finally, Pratt argues that its acknowledgement of Peterson's relationship with Alshaw when Pratt and Peterson executed the Consulting Agreement does not undercut Pratt's claim of reliance because Pratt expended resources and time on training and onboarding Peterson, and, further, because Pratt was not aware that Alshaw was a competing government contractor.  (*Id.* at PageID# 308.)

The Court concludes that Pratt has plausibly alleged a fraudulent inducement claim in Count 6.  Under the heightened pleading standard of Fed. R. Civ. P. 9, Pratt must allege, at a minimum,

> the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' However, 'allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made.' The threshold test is whether the complaint places the defendant on 'sufficient notice of the misrepresentation,' allowing the defendants to 'answer, addressing in an informed way plaintiffs [sic] claim of fraud.'

*Cork-Howard Constr. Co. v. Dirty D Props., LLC*, No. 16-cv-1964, 2017 WL 5574145, at *2 (N.D. Ohio Nov. 20, 2017).  In other words, "a plaintiff must at least 'allege the time, place, and content of

44

the alleged misrepresentation on which he or she relied.'" *Duff v. Centene Corp.*, 565 F. Supp. 3d 1004, 1026 (S.D. Ohio 2021) (quoting *Premier Business Grp., LLC v. Red Bull of N.A., Inc.*, No. 08-cv-01453, 2009 WL 3242050, at *8 (N.D. Ohio Sept. 30, 2009)).

In its Complaint, Pratt alleges the time, place, and content of Peterson's fraud to be as follows: during the screening and training process, and prior to the signing of the contract, Peterson allegedly told Pratt that she was an employee and engineer of "Atech/Atechoma" and needed to provide her employer with two weeks' notice of her resignation, and, further, that just prior to executing her contract with Pratt, Peterson requested her time be billed through Alshaw—but did not divulge that she was the CEO and founder of Alshaw, a competing government contracting company.  (Doc. No. 1, ¶¶ 20-21, 62.)  Pratt also alleges that Peterson intended to conceal her actual designation as Alshaw CEO to increase the likelihood of obtaining the FRB project contract because Peterson knew that otherwise divulging her status as Alshaw CEO "would limit her chance of getting a contract with AB Pratt for FRB since AB Pratt only does business with qualified individual consultants and Alshaw is a direct competitor for AB Pratt and BPG."  (*Id.* at ¶ 20.)  Thus, Pratt sufficiently alleged the time, place, and content of the alleged misrepresentation.  The Court concludes that Pratt meets Fed. R. Civ. P. 9's heightened pleading standard.

Additionally, the Court concludes that Pratt sufficiently alleges damages at this stage in the proceedings.  Damages arising from fraudulent inducement "must be separate and distinct from the damages" arising from a breach of contract claim.  *Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir. 2000).  "The tort injury must be unique and separate from any injury resulting from a breach of contract."  *Id.*  "A party fraudulently induced into entering a contract may

45

seek rescission of the contract or seek damages based on the tort, which may include out-of-pocket losses incurred due to the parties' contract." *Duff*, 565 F. Supp. 3d at 1027.

In its fraudulent inducement claim, Pratt seeks "damages in an amount to be established at trial due to AB Pratt's loss of business" stemming from Peterson's misappropriation of Pratt's business opportunities with BPG. (Doc. No. 1, ¶ 63.) In Counts 7 and 10, Pratt's remaining breach of contract claims, *see supra* VI.B.1., Pratt requests specific performance of its contracts barring the Peterson Defendants' use of Pratt's Confidential Information, and damages to be established at trial resulting from the Peterson Defendants' use of Pratt's Confidential Information. (Doc. No. 1, ¶¶ 70, 85.) As the *Duff* court observed, the Court "will not hesitate to dispose of this claim in the future" if it emerges that the damages are duplicated between Pratt's fraud claim and breach of contract claims. *See Duff*, 565 F. Supp. 3d at 1027. However, based solely on its review of the Complaint, the Court finds that Pratt's requested damages for Count 6 do not appear to overlap with its requested damages for Counts 7 and 10.

Finally, the Court disagrees with the Peterson Defendants that Count 6 is undercut by Pratt's other allegations. Pratt alleges that, despite the FRB's initial rejection of Peterson, it was confident that Peterson stood a good chance of being accepting for an FRB Project with proper training and onboarding. (Doc. No. 1, ¶ 19.) According to Pratt, it invested significant resources in training and coaching Peterson so that the FRB would hire her. (*Id.* at ¶¶ 19-20.) Indeed, Peterson acknowledges that this training and expenditure of resources took place before the contract was executed. (*See* Doc. No. 23, PageID# 422.) Though Peterson argues that it was "uncertain" at the time whether she would be placed with the FRB, Pratt invested its time and resources into developing Peterson as an FRB candidate in hopes of executing its contracts with the Peterson Defendants. (Doc. No. 1, ¶¶ 62-63.)

Accordingly, the Court concludes that Pratt's allegations of fraudulent inducement are sufficient to withstand Peterson's Motion to Dismiss.

### 4. Tortious Interference

In Count 8, Pratt alleges that Peterson tortiously interfered with Pratt's contract with BPG. (Doc. No. 1, ¶¶ 71-74.) Specifically, Pratt alleges that Peterson, through Alshaw, directly sought business with the FRB "behind BPG's back," thus undermining BPG's contract with the FRB. (*Id.* at ¶ 73.) Pratt alleges that Peterson's actions therefore "affected" Pratt's contract with BPG, along with the BPG-FRB agreement, and "caus[ed] a churn in AB Pratt's staff and AB Pratt's reputation." (*Id.* at ¶ 74.)

The Peterson Defendants argue that Pratt's tortious interference claim is fundamentally flawed because Pratt fails to allege the existence of a contract. (Doc. No. 15-1, PageID# 189.) The Peterson Defendants assert that Pratt did not have a contract with BPG at the time of Peterson's alleged interference with the BPG-FRB contract because BPG had previously terminated its contract with Pratt for reasons unrelated to Peterson. (*Id.*) The Peterson Defendants argue that because Peterson did not procure the breach and Pratt suffered no damages, Pratt does not state a viable claim for tortious interference. (*Id.* at PageID# 190.)

In its Opposition, Pratt briefly argues that, despite the timeline of BPG's termination of its contract with Pratt, BPG continues to have ongoing confidentiality obligations pursuant to that agreement, and Peterson "has engaged in actions to procure BPG's breach of those obligations." (Doc. No. 22, PageID# 308.)

In their Reply, the Peterson Defendants argue that Pratt does not allege anywhere in its Complaint that Peterson procured BPG's breach of any confidentiality obligations BPG owes to Pratt. (Doc. No. 23, PageID# 423.)

As an initial matter, the Court notes that the Peterson Defendants represent that Ohio law applies to Pratt's tortious interference claim. (Doc. No. 15-1, PageID# 189.) Pratt does not address whether Ohio or Illinois law applies to its tortious interference claim. (Doc. No. 22, PageID# 308.) The Court concludes that, whether Illinois or Ohio law applies, Pratt fails to state a claim for tortious interference in Count 8. To set forth a claim of tortious interference with contractual relationships under Ohio law, one must allege "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Miami Valley Mobile Health Servs.*, 852 F. Supp. 2d at 942 (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)) (internal quotation marks omitted). Likewise, to set forth a claim of tortious interference with contractual relationships under Illinois law, a plaintiff must allege "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citing *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (1989))).

The Court concludes that Pratt fails to plead that Peterson intentionally procured any alleged breach of the BPG-Pratt contract. Pratt does not allege that Peterson procured BPG's myriad alleged breaches. According to Pratt, BPG allegedly breached their contract repeatedly throughout 2021 and

48

2022, culminating in BPG terminating its contract with Pratt on May 27, 2022. (*See, e.g.,* Doc. No. 1, ¶¶ 14, 18, 23.) Further, Pratt alleges that Peterson's alleged interference took place in June 2022, i.e., *after* BPG terminated its contract with Pratt. (*Id.* at ¶¶ 24, 73.) Peterson's June actions could not have possibly procured BPG's termination of the BPG-Pratt contract in May 2022. Finally, Pratt does not allege anywhere in its Complaint that Peterson procured BPG's breach of any ongoing confidentiality obligations BPG may owe Pratt. Accordingly, the Court concludes that Pratt fails to sufficiently plead its tortious interference with a contract claim. Count 8 is dismissed.

**VII.    Motion to Dismiss Counterclaims 2 through 4 for Failure to State Claim**

The Court now turns to the final pending Motion: Pratt's Partial Motion to Dismiss BPG's and VN's (collectively, the "BPG Defendants") Counterclaim Counts 2 through 4 Under Rule 12(b)(6), or Alternatively, its Motion for More Definite Statement as to Counterclaim Counts 2 through 4 Under Rule 12(e).[4] (Doc. No. 19.) The BPG Defendants did not file any opposition in response to Pratt's Motion.

As an initial matter, by not opposing Pratt's arguments in its Partial Motion to Dismiss, the BPG Defendants have waived any opposition thereto. *See, e.g., Humphrey v. U.S. Attorney General's Office*, 279 Fed. Appx 328, 331 (6th Cir. 2008) (finding that a plaintiff's failure to oppose arguments raised in the defendants' motion to dismiss is grounds for the district court to assume that opposition to the motion is waived). *See also Notredan, LLC v. Old Republic Exch. Facilitator Co.*, 531 Fed. App'x 567 (6th Cir. 2013) (concluding plaintiff waived claim by failing to respond to or refute arguments made by the defendants in district court); *Selou v. Integrity Solution Services, Inc.*, 2016 WL 612756 at * 3 (E.D. Mich. Feb. 16, 2016) ("Plaintiff's failure to address any claim but her TCPA

---

[4] Because the Court dismisses Counterclaims 2 through 4 as set forth herein, the Court need not address Pratt's arguments in support of its alternative motion for a more definite statement.

49

claim in response to LiveVox's motion to dismiss is cause for dismissing those claims."); *Ullmo v. Ohio Turnpike*, 126 F.Supp.3d 910, 919 (N.D. Ohio 2015) (finding that plaintiff abandoned claim where he failed to respond to defendant's motion to dismiss). Thus, the BPG Defendants' failure to oppose Pratt's arguments constitutes sufficient cause to dismiss the BPG Defendants' Counterclaim 2, breach of contract, Counterclaim 3, tortious interference with a contractual relationship, and Counterclaim 4, violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq* against Pratt. (*See* Doc. No. 13, Counterclaims ¶¶ 18-40.) Nonetheless, the Court will briefly address the substance of Pratt's arguments.[5]

### A.     Sufficiency of the BPG Defendants' Allegations in Counterclaim 2

In Counterclaim 2, the BPG Defendants allege that Pratt breached the terms of its Contract Service Agreement (the "CSA") with BPG and "harvested Bridgeport Group's confidential information, including information regarding its contacts within FRB, work product of its employees and consultants, and other information related to its work with FRB." (Doc. No. 13, Counterclaims, ¶ 22.) The BPG Defendants allege that Pratt used the confidential information to improperly contact FRB and accuse BPG of improper conduct, with the intent of harming BPG's relationship with FRB. (*Id.*)

Pratt argues that Counterclaim 2 lacks sufficient facts to support a plausible breach of contract claim, and instead states legal conclusions without any allegations from which the Court could find those conclusions plausible. (Doc. No. 19, PageID# 265.) Pratt argues that the BPG Defendants fail to identify what "confidential information" Pratt misused, beyond "information regarding contacts within FRB, work products of its employees and consultants, and other information related to its work

---

[5] The Court reincorporates the Fed. R. Civ. P. 12(b)(6) standard of review set forth above. *See supra*, Section VI. A.

for FRB." (*Id.*) Pratt posits that Counterclaim 2 may vaguely reference weekly timecard and timesheet activities that Pratt and BPG jointly shared under their contract, and that Pratt claims it regularly provided to BPG. (*Id.*)

To succeed on a breach of contract claim under Illinois law[6], "a plaintiff must prove '(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff.'" *Thomas v. Today's Growth Consultant, Inc.*, No. 15-CV-06015, 2018 WL 3496095, at *2 (N.D. Ill. July 20, 2018) (quoting *Burkhart v. Wolf Motors of Naperville, Inc.*, 2016 IL App (2d) 151053, ¶ 14, 61 N.E.3d 1155, 1159 (Ill. App. Ct. 2016)).

For the following reasons, the Court concludes that, on its face, the BPG Defendants' Counterclaim 2 contains insufficient factual allegations to support their breach of contract claim. In a single paragraph, the BPG Defendants allege that Pratt harvested BPG's "confidential information, including information regarding its contacts within FRB, work product of its employees and consultants, and other information related to its work with FRB." (Doc. No. 13, ¶ 22.) The BPG Defendants do not allege any facts to further explain how such information is confidential and/or proprietary under the "Confidential Information" definition set forth in Section 4.1 of the CSA. (*See* Doc. No. 1-1, § 4.1, "Definition.") Further, the BPG Defendants do not allege any facts about Pratt's alleged contact with the FRB. For example, the BPG Defendants do not allege who Pratt may have contacted at the FRB (even in general terms such as by job title), when and/or where such communication was initiated, or how Pratt contacted the FRB. Thus, the BPG Defendants' allegations do not plausibly indicate any such communication occurred. The BPG Defendants also

---

[6] Per § 10.4 of the CSA, the Agreement shall be governed by Illinois law. (Doc. No. 1-1, § 10.4)

do not allege any facts to support its allegation that Pratt intended to harm BPG's relationship with FRB. Moreover, the BPG Defendants' allegation that Pratt's actions caused BPG to suffer harm to its reputation and goodwill is undermined by the BPG Defendants' allegation that FRB terminated its program with BPG "to reallocate funds to other government priorities." (Doc. No. 13, ¶ 11.) Upon review of the BPG Defendants' Counterclaim 2, the Court concludes that the BPG Defendants' allegations do not contain facts, but instead are vague legal conclusions "masquerading as factual allegations." *Heyne v. Metropolitan Nashville Public Schools*, 655 F.3d 556, 564 (6th Cir. 2011) (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010)). The Court declines to accept these legal conclusions as true. *Id.* Accordingly, Counterclaim 2 is dismissed.

### B. BPG Defendants Fail to State Claim for Tortious Interference

In Counterclaim 3, the BPG Defendants allege that Pratt tortiously interfered with BPG's contract with FRB. (Doc. No. 13, ¶¶ 24-29.) The BPG Defendants alleged that Pratt "improperly contacted FRB" and accused BPG of "improper conduct . . . with the purpose and intent of harming" BPG's relationship with FRB for Pratt's own benefit. (*Id.* at ¶ 26.) The BPG Defendants allege that Pratt's interference with BPG's "relationship with FRB caused harm to" BPG. (*Id.* at ¶ 28.)

Pratt asserts that Counterclaim 3 should be dismissed because the BPG Defendants fail to allege any information as to Pratt's alleged supposed tortious conduct. (Doc. No. 19, PageID# 267.) Pratt argues that Counterclaim 3 fails to establish any of the required elements of a claim for tortious interference with a contract. (*Id.*) Moreover, Pratt asserts, the BPG Defendants cannot demonstrate that Pratt procured a breach of the BPG-FRB contract because, per the BPG Defendants' own allegations, the FRB terminated its contract with BPG to reallocate its funds to other government priorities. (*Id.* at PageID# 268.)

52

The Court notes that Pratt represents that Ohio law applies to the BPG Defendants' tortious interference claim.  (*Id.*)  The BPG Defendants do not respond, so their position as to whether Ohio or Illinois law applies is unknown.  However, as discussed *supra*, the elements of a tortious interference claim are the same under Ohio and Illinois law.  *See supra*, Part. VI.B.4.  Thus, the Court concludes that, irrespective of whether Ohio or Illinois law applies, the BPG Defendants fail to state a claim for tortious interference in Counterclaim 3.

To set forth a claim of tortious interference with contractual relationships, one must allege "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages."  *Miami Valley Mobile Health Servs.*, 852 F. Supp. 2d at 942 (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)) (internal quotation marks omitted).  Likewise, to set forth a claim of tortious interference with contractual relationships under Illinois law, a plaintiff must allege "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages."  *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citing *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (1989)).

The BPG Defendants clearly and unambiguously allege that the FRB terminated its program with BPG to reallocate the FRB's funds "to other government priorities."  (Doc. No. 13, ¶ 11.)  The BPG Defendants do not allege anywhere that the FRB breached the BPG-FRB contract, let alone that Pratt procured such a breach.  In the absence of such a breach of the BPG-FRB contract, the BPG

Defendants fail to state a claim for tortious interference with a contract against Pratt as a matter of law.  *BCG Masonic Cleveland, LLC v. Live Nation Entertainment, Inc.*, 570 F. Supp. 3d 552, 558 (N.D. Ohio 2021).

    **C.**       **Defend Trade Secrets Act**

      In Counterclaim 4, the BPG Defendants allege that BPG has developed certain trade secrets in the course of its business, and that BPG has taken substantial measures and exercised due diligence to prevent these trade secrets from becoming available to outsiders.  (Doc. No. 13, ¶¶ 31-34.)  The BPG Defendants allege that Pratt violated the Defend Trade Secrets Act (DTSA) when it "improperly misappropriated confidential trade secrets of Bridgeport Group through a former consultant placed by a related A.B. Pratt company."  (*Id.* at ¶ 37.)  The BPG Defendants allege that Pratt "used this trade secret information to improperly contact FRB directly, and accuse Bridgeport Group of improper conduct," and that Pratt "did so with the purpose and intent of harming" BPG's relationship with the FRB.  (*Id.* at ¶ 38.)  The BPG Defendants allege that Pratt is liable to BPG for misappropriating BPG's trade secrets "knowingly, willfully, maliciously, intentionally, and in bad faith . . . ."  (*Id.* at ¶ 40.)

      Pratt argues that the BPG Defendants fail to state a plausible claim under the DTSA.  (Doc. No. 19, PageID# 268.)  Pratt argues that courts examining the DTSA have held that complaints that only claim general categories of information and data as trade secrets fail to state claims under the DTSA because such general allegations do not put the defendant on sufficient notice of the claim for misappropriation.  (*Id.* at PageID# 268-69.)  Pratt argues that the BPG Defendants fail to identify any trade secrets beyond "nebulous" categories of general information.  (*Id.* at PageID# 269.)

The DTSA requires a plaintiff to plead: (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce," *id.* § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, *id.* § 1839(5). *Oakwood Lab. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (citing 18 U.S.C. § 1836(b)(1), (3)).

> **[I]nformation alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it.** But a plaintiff need not spell out the details of the trade secret to avoid dismissal. Rather, the subject matter of the trade secret must be described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies. Beyond those outer boundaries, however, deciding whether a plaintiff has sufficiently disclosed its trade secrets is a fact-specific question to be decided on a case-by-case basis.

*Oakwood Lab.*, 999 F.3d at 906 (quotations and citations omitted) (emphasis added).

Though a party need not "reveal its secrets in the complaint simply to prove that they exist," a party cannot "get away with nebulous descriptions at the highest level of generality." *TRB Acquisitions LLC v. Yedid*, Case No. 20-cv-0552, 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021); *see also Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d. 396, 404 (S.D.N.Y. 2021). A complaint "that only claims general categories of information and data as trade secrets does not state a claim under the DTSA because it does not adequately put the defendant on sufficient notice of the contours of the claim for misappropriation." *Id.*

In *Zurich Am. Life Ins. Co. v. Nagel*, the plaintiff alleged that the defendant emailed certain "trade secrets" to himself, including "corporate governance documents, board resolutions,

biographical affidavits containing sensitive personal information for Zurich senior executives, and financial reports." 583 F. Supp. 3d at 404. The plaintiff further alleged that "competitor could use the information to unfairly compete with Zurich, divert its customers, and undercut its business," and "the disclosure of personal and highly sensitive information of Zurich employees[ ] [could] compromis[e] Zurich's business reputation and the trust it has cultivated with its personnel." *Id.* The court concluded that "[t]hese allegations are insufficiently precise to demonstrate the existence of a trade secret under the DTSA," and that such "nebulous categories of documents" do not give rise to a plausible inference that the defendant emailed himself trade secrets. *Id.*

The Court concludes that the BPG Defendants failed to plead the existence of a trade secret under the DTSA. In Counterclaim 4, the BPG Defendants allege that it has "expended substantial time, labor and money to research proprietary business methods, strategies, technologies, processes, services, marketing plans and procedures, and other confidential and proprietary information." (Doc. No. 13, ¶ 31.) The BPG Defendants further allege that Pratt "improperly misappropriated confidential trade secrets of Bridgeport group" and "used this trade secret information" to contact the FRB. (*Id.* at ¶¶ 37, 38.) These allegations are vague, nebulous, and do not put Pratt on sufficient notice of the contours of the BPG Defendants' claim. *See Zurich*, 583 F. Supp. 3d at 404. These vague allegations do not give rise to the plausible inference that Pratt misappropriated any BPG trade secrets. Accordingly, Counterclaim 4 is dismissed.

## VIII. Conclusion

For the reasons set forth above, the Peterson Defendants' Combined Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State Claim, or, Alternatively, Motion to Transfer Venue is GRANTED IN PART and DENIED IN PART as set forth herein. The Peterson Defendants'

Motion to Disregard and/or Strike Portions of the Declaration of Abbie Pratt is DENIED.  Pratt's

Motion for Leave to File Surreply in Opposition to the Peterson Defendants' Motion to Dismiss is

DENIED.  Pratt's Motion to Dismiss the BPG Defendants' Counterclaim Counts 2 through 4 under

Rule 12(b)(6), or Alternatively, a Motion for More Definite Statement under Rule 12(e).is

GRANTED.

**IT IS SO ORDERED.**

                                         *s/Pamela A. Barker*

                                         PAMELA A. BARKER

Date:  April 10, 2023                        U. S. DISTRICT JUDGE